Filed 8/7/23  P. v. Gutierrez CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B320667 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA202688) |
| v. | |
| ADRIAN GUTIERREZ, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Curtis Rappe, Judge.  Affirmed.

Nancy Tetreault, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance Winters, Assistant Attorney General, Susan Pithey, Senior Assistant Attorney General, Idan Ivri and Gary Lieberman, Deputy Attorneys General, for Defendant and Respondent.

Defendant and appellant Adrian Gutierrez was convicted of second degree murder in 2000. Gutierrez now appeals from an order denying his petition for resentencing under Penal Code section 1172.6.[1] After an evidentiary hearing, the trial court concluded that Gutierrez was ineligible for resentencing because he was guilty of implied malice second degree murder as an aider and abettor. Gutierrez argues that the trial court's findings are not supported by substantial evidence. We disagree and affirm the order denying Gutierrez's petition for resentencing.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### I. The underlying offense

We take our statement of the evidence underlying Gutierrez's crime from the Court of Appeal opinion affirming his

---

[1] All further undesignated statutory references are to the Penal Code.

Effective June 30, 2022, former section 1170.95 was renumbered to section 1172.6 with no change in text. (Stats. 2022, ch. 58, § 10.) We therefore refer to the law formerly codified at section 1170.95 as section 1172.6.

[2] We have taken judicial notice of records from Gutierrez's prior appeal, *People v. Gutierrez* (Nov. 30, 2021, B304522) [nonpub. opn.] (*Gutierrez II*); namely, the trial court's January 17, 2020 order denying his section 1172.6 petition and the clerk's transcript, which includes the reporter's transcript of the trial.

2

judgment of conviction. (*People v. Gutierrez* (July 31, 2002, B149815) [nonpub. opn.] (*Gutierrez I*).)[3]

"[O]n the evening of November 25, 1999, Thanksgiving Eve, Debra Luna went to Gina's Bar in the City of Commerce with her friend, Roseann Aguilar. During the evening, they went across the street to Nin[o]'s Bar. Numerous members of the Mongols motorcycle gang were present at Nin[o]'s Bar. [Fn. omitted.] Gutierrez was one of the Mongols in the bar that evening. Gutierrez told Luna his name was 'Panhead' and displayed a tattoo on his left arm of the word 'pan' and a Mongol head in a frying pan. [Fn. omitted.] Gutierrez asked Luna to purchase a raffle ticket to support children and the homeless. Luna paid $5 for the ticket and Gutierrez wrote his name and address on the back of the ticket. Shortly thereafter, Luna returned to Gina's Bar. Several Mongols, including Gutierrez, also went across the street to Gina's Bar. Gutierrez appeared to be the leader and the other individuals wearing Mongol[s] jackets listened to him.

"Jeremy McDonald, then a Mongol[s] 'prospect,' testified under a grant of use immunity. [Fn. omitted.] Gutierrez approached McDonald in Gina's Bar and asked for McDonald's buck knife. [Fn. omitted.] There was no urgency in Gutierrez's request and there was no altercation in the bar at that time.

---

[3] In reviewing a section 1172.6 petition, a trial court may rely on "the procedural history of the case recited in any prior appellate opinion." (§ 1172.6, subd. (d)(3); see also *People v. Clements* (2022) 75 Cal.App.5th 276, 292 (*Clements*).) However, the role of an appellate opinion is limited, and the trial court may not rely on factual summaries contained in prior appellate decisions or engage in fact finding at the prima facie stage. (*Clements*, at p. 292.)

After McDonald gave Gutierrez the knife, Gutierrez told McDonald to escort one of the Mongol[s] officers to the bathroom and guard the door while the officer was in the bathroom.

"At about the same time, Luna was seated near the front door. Daniel Herrera, Luna's common law husband and the father of her three children, came to the door of Gina's Bar. Herrera angrily asked why Luna had not answered her cellular telephone and why she was there with 'all these fucking [Mongols].' Gutierrez and four of five other Mongols immediately ran to the door of the bar and attacked Herrera. The first person to approach Herrera was Gutierrez.[4] Luna pleaded with the Mongols to desist but they continued to beat Herrera with their fists and feet. Herrera ran but the Mongols chased him down the street out of Luna's sight.

"Aguilar observed the fight from the front of Nin[o]'s Bar and testified Gutierrez was one of the bikers who was hitting and kicking Herrera.

"McDonald heard a thump while he was guarding the bathroom and, when McDonald returned to the bar, it was empty. McDonald saw a group of individuals wearing Mongol[s] jackets about half a block down the street. The group walked away from a male on the ground. As the group walked back to the bar, the man got up and ran toward the sidewalk.

"Luna testified the Mongols ran back to Gina's bar. Gutierrez was 'all sweaty and perspiring....' Gutierrez and another Mongol[s] approached Luna and demanded the raffle ticket with Gutierrez's telephone number on it. Gutierrez and his associate threatened to 'take care of' Luna if she did not comply.

---

[4]     Luna testified that she saw Gutierrez hit Herrera.

4

Luna returned the ticket and asked for the return of her $5. Gutierrez gave Luna the money. Luna drove home but, when she found Herrera was not there, she returned to the scene.

"At approximately 12:25 a.m., Sheriff's Deputy Scott Hennessey found a trail of blood that went from Washington Boulevard around the corner onto O'Neil Street and stopped at Herrera's body. Luna arrived shortly thereafter. Hennessey spoke to Luna and observed her to be hysterical and stumbling. Hennessey opined Luna was drunk and very upset.

"Approximately five hours later, Sheriff's Detective Michael Scott noticed the odor of alcohol about Luna during an interview but testified any difficulty Luna had communicating with Scott was due to the fact she was upset rather than intoxicated. Luna and Aguilar selected Gutierrez's picture from a photographic lineup and indicated he was one of the individuals in the bar on the night of this incident.

"A deputy medical examiner testified Herrera died as the result of a stab wound to the torso with contributing conditions of blunt force trauma. The stab wound was consistent with a buck knife, which is sharp on only one side. Had Herrera only been stabbed, he might have survived the injury.

"William Queen, a special agent for the Bureau of Alcohol, Tobacco and Firearms (ATF), infiltrated the San Fernando Chapter of the Mongols in an undercover operation that lasted from March 1998 until May of 2000. Queen became the secretary/treasurer of the chapter and, in this capacity, received a copy of the Mongol[s] constitution. Queen testified the goal of the Mongols was to be the 'top dog outlaw motorcycle club in the country, the baddest club on bikes out there.' Outlaw motorcycle gangs, such as the Hell's Angels and the Mongols, refer to

5

themselves as 'one percenter[s].' This term is meant to separate these outlaw motorcycle gangs, who consider themselves to be above the law, from law-abiding motorcycle organizations. The Mongols committed crimes to establish their reputation including narcotics trafficking, gun violations, extortion, assaults, witness intimidation, theft and other crimes.

"The day after Herrera's death, the Mongols issued a 'code 55,' which meant members were not to wear their Mongol[s] jackets when riding their motorcycles. The purpose of the Code 55 was to protect one of the Mongols from arrest. That same day, McDonald, who was a member of the San Fernando Chapter of the Mongols, told Queen that Gutierrez asked McDonald for his knife right before the altercation at the bar. Queen saw Gutierrez approximately two weeks after Herrera's death and noticed his appearance had changed significantly in that Gutierrez no longer had any facial hair. About a month and a half later, Gutierrez had a new skull and crossbones patch on his Mongol[s] jacket. The Mongol[s] constitution indicated a skull and crossbones patch would be awarded to members who provide outstanding service to the club. However, Queen learned the skull and crossbones patch was given to an individual who killed for the club. During a search of Gutierrez's home, his motorcycle was found to have a skull and crossbones on the taillight.

"In surreptitiously tape recorded conversations with Gutierrez on December 21, 1999 and January 6, 2000, Queen tried to get Gutierrez to confess to the murder of Herrera by complimenting Gutierrez on how he had 'upped ... the image of the Mongols two whole fucking notches....' Queen indicated he wanted Gutierrez with him if there was trouble. In the course of one of these conversations, Gutierrez said they should not be

6

speaking about the incident, 'we never did nothing,' and 'I was home making ... turkey and pie with one of my mother-in-laws. That's where I was ... with my old lady that night.' However, Queen testified Gutierrez's tone of voice during this conversation did not sound like a denial.

"ATF Special Agent John Ciccone was responsible for protecting Queen, directing the investigation and maintaining contact between Queen and ATF during Queen's undercover work. Ciccone testified as a gang expert that violent crime is one of the Mongols['s] primary reasons for acting as a gang. A member of the Mongols who exhibited a skull and crossbones patch without having earned the patch would be kicked out of the club, assaulted or have his motorcycle taken."

## II.  Gutierrez's conviction, sentence, and direct appeal

At Gutierrez's criminal trial for Herrera's murder, the jury was instructed on the natural and probable consequences doctrine. That is, if the jury found an assault was committed, Gutierrez aided and abetted that assault, a coprincipal committed the crime of murder, and murder was a natural and probable consequence of the assault, then Gutierrez could be guilty of murder. A jury found Gutierrez guilty of second degree murder (§§ 187, subd. (a), 189, subd. (b)) and found true a gang allegation (§ 186.22, subd. (b)). The jury found not true the allegation that Gutierrez personally used a knife.

On April 13, 2001, the trial court sentenced Gutierrez to 15 years to life plus three years for the gang enhancement.

A different panel of this Division affirmed the judgment of conviction on direct appeal. (*Gutierrez I*, *supra*, B149815.)

7

## III. Gutierrez's petitions for resentencing and evidentiary hearings

In 2019, Gutierrez petitioned for resentencing under section 1172.6. After an evidentiary hearing, the trial court denied the petition, finding there was substantial evidence to support Gutierrez's conviction for second degree murder as the actual perpetrator or a direct aider and abettor. On appeal, another panel of this Division reversed the order denying Gutierrez's petition because the trial court "erred by applying the substantial evidence test and not acting as an independent fact finder or applying the beyond a reasonable doubt standard." (*Gutierrez II*, *supra*, B304522.)

On remand and after receiving additional briefing, the trial court held another evidentiary hearing on Gutierrez's petition. At the hearing, the parties did not introduce new evidence and instead relied on the record from Gutierrez's criminal trial, including the reporter's transcript of the trial.[5] The prosecutor argued that after Herrera insulted the Mongols, Gutierrez initiated the fight. The evidence further showed that Gutierrez obtained a knife "just moments" before the fight broke out, Gutierrez and other gang members beat Herrera and followed him to the street, Gutierrez made incriminating statements after the incident, and Gutierrez had a leadership position in the gang. Based on this evidence, the prosecutor argued that even if the trial court did not find that Gutierrez stabbed Herrera, Gutierrez was at least a direct aider and abettor who acted with implied malice. Gutierrez's counsel argued that the case was "more

---

[5] Judge Rappe had presided over Gutierrez's criminal trial in 2000 and said he had a good recollection of it.

8

genuinely just a natural and probable consequences" one, and there was insufficient evidence Gutierrez intended to kill or acted with conscious disregard to human life.

The trial court again denied the petition, finding that the People had met their burden of proving beyond a reasonable doubt that Gutierrez was guilty of implied malice second degree murder as a direct aider and abettor or as "part aider and abettor and part perpetrator."

## DISCUSSION

Gutierrez contends that there was insufficient evidence he was guilty of implied malice second degree murder as an aider and abettor. After setting forth the relevant law and standard of review, we explain why his contention is incorrect.[6]

## I.    Senate Bill No. 1437 and section 1172.6

Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) eliminated the natural and probable consequences doctrine as a basis for finding a defendant guilty of murder and limited the scope of the felony murder rule. (*People v. Reyes* (2023) 14 Cal.5th 981, 986 (*Reyes*); *People v. Strong* (2022) 13 Cal.5th 698, 707–708 (*Strong*); *People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*); *People v. Gentile* (2020) 10 Cal.5th 830, 842–843 (*Gentile*).) The bill amended section 188 by adding the

---

[6]    Because our review is after an evidentiary hearing under section 1172.6, subdivision (d)(3), Gutierrez's focus in his appellate briefs on the prosecutor's reliance on the natural and probable consequences doctrine at the 2000 criminal trial is misplaced. Our review after an evidentiary hearing focuses on whether there was sufficient evidence to convict the defendant under the law as amended by sections 188 and 189. (See § 1172.6, subd. (d)(3).)

9

requirement that, except as stated in section 189, subdivision (e), "in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).)

Senate Bill 1437 also created a procedure, now codified at section 1172.6, for a person convicted of murder under the former law to be resentenced if the person could no longer be convicted of murder under amended section 188. (*Lewis*, *supra*, 11 Cal.5th at p. 959; *Gentile*, *supra*, 10 Cal.5th at p. 847.) A defendant commences that procedure by filing a petition containing a declaration that, among other things, the defendant could not presently be convicted of murder under the current law. (*Strong*, *supra*, 13 Cal.5th at p. 708.) If the trial court receives a petition that establishes a prima facie case for relief, it must appoint counsel for the petitioner, if requested. The trial court also must issue an order to show cause and hold an evidentiary hearing. (*Ibid.*; § 1172.6, subds. (b)(3), (c), & (d)(1).) At the evidentiary hearing, it is the prosecution's burden to prove beyond a reasonable doubt that the petitioner is ineligible for resentencing. (§ 1172.6, subd. (d)(3); *Strong*, at pp. 708–709; *People v. Vargas* (2022) 84 Cal.App.5th 943, 951 (*Vargas*).) If the trial court finds beyond a reasonable doubt that the petitioner is guilty of murder notwithstanding the amendments to sections 188 and 189, the petitioner is ineligible for relief under section 1172.6. (*Strong*, at pp. 708–709; *Vargas*, at p. 951.)

## II.    Standard of review

We review the trial court's findings after an evidentiary hearing under section 1172.6, subdivision (d)(3), for substantial evidence. (*People v. Owens* (2022) 78 Cal.App.5th 1015, 1022

10

(*Owens*); *People v. Werntz* (2023) 90 Cal.App.5th 1093, 1109–1110 (*Werntz*).) Under this standard, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Vargas*, *supra*, 84 Cal.App.5th at p. 951; *Clements*, *supra*, 75 Cal.App.5th at p. 298.) We do not resolve credibility issues or evidentiary conflicts. (*Owens*, at p. 1022.) Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. (*People v. Brooks* (2017) 3 Cal.5th 1, 57.) Before we may set aside a trial court's order, it must be clear that " ' "upon no hypothesis whatever is there sufficient substantial evidence to support [it]." ' [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

## III. Substantial evidence supports the trial court's finding that Gutierrez could be convicted of implied malice second degree murder as an aider and abettor

Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) Malice may be express or implied. (§ 188, subd. (a).) "It is express when there is a manifest intent to kill (§ 188, subd. (a)(1)); it is implied if someone kills with 'no considerable provocation ... or when the circumstances attending the killing show an abandoned and malignant heart.' (§ 188, subd. (a)(2))." (*Gentile*, *supra*, 10 Cal.5th at p. 844.) "The primary difference between express malice and implied malice is that the former requires an intent to kill but the latter does not." (*People v. Soto* (2018) 4 Cal.5th 968, 976.)

11

Implied malice murder instead requires that the killing be proximately caused by an act, " ' " 'the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' [Citation.]" (*Reyes, supra*, 14 Cal.5th at p. 988.) Proximate causation thus requires the act to have been a substantial factor contributing to the death. (*Ibid.*)

The guilt of an aider and abettor to a crime, including murder, is "based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117.) "A person aids and abets the commission of a crime when [the person], (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164.)

Accordingly, for aiding and abetting liability on a theory of implied malice murder to be imposed, a direct aider and abettor must, by words or conduct, aid the perpetrator's commission of a life-endangering act with the "knowledge that the perpetrator intended to commit the act, intent to aid the perpetrator in the commission of the act, knowledge that the act is dangerous to human life," and the aider and abettor must act "in conscious disregard for human life." (*People v. Powell* (2021) 63 Cal.App.5th 689, 713, italics omitted, cited with approval by *Reyes, supra*, 14 Cal.5th at p. 991 [implied malice murder requires proof of aider and abettor's "knowledge and intent with regard to the *direct perpetrator's* life endangering act"].) In other

12

words, under current law, "a direct aider and abettor of the killing who knew that his (or her) conduct endangered the life of another and acted with conscious disregard for life, may be guilty of second degree murder." (*People v. Langi* (2022) 73 Cal.App.5th 972, 979.)

While Senate Bill 1437 eliminated natural and probable consequences liability for second degree murder based on imputed malice, implied malice remains a valid theory of second degree murder liability for an aider and abettor. (*Reyes, supra,* 14 Cal.5th at p. 991; *Gentile, supra,* 10 Cal.5th at p. 850; *People v. Vizcarra* (2022) 84 Cal.App.5th 377, 388; *Werntz, supra,* 90 Cal.App.5th at p. 1112.)

Viewing the evidence here in the light most favorable to the trial court's order, the record contains substantial evidence that Gutierrez aided and abetted the murder of Herrera with implied malice.

There was substantial evidence that Gutierrez engaged in life endangering acts that proximately caused Herrera's death. *Reyes, supra,* 14 Cal.5th 981, clarified what types of acts proximately cause death. In that case, the defendant Reyes was at a park with fellow gang members, one of whom openly displayed a gun. (*Id.* at p. 985.) After someone in Reyes's group called out to a passing car, the group chased the car, and someone shot at the car, killing its driver. (*Ibid.*) At Reyes's trial for murder, the prosecutor did not contend Reyes was the shooter but instead argued he was guilty of murder under the natural and probable consequences doctrine or as a direct aider and abettor. A jury convicted Reyes of second degree murder. Years later, a court denied his section 1172.6 petition, finding, among other things, that Reyes's act of traveling with an armed fellow

gang member into rival gang territory was dangerous to human life, Reyes knew it was so, and he acted with conscious disregard of that danger.  (*Reyes*, at p. 987.)

Reyes*, *supra*, 14 Cal.5th at pages 988 to 989, explained such an act merely created a dangerous situation in which death was possible, depending on how circumstances unfolded, and standing alone did not satisfy the proximate causation requirement of implied malice murder.  Further, there was no evidence Reyes's "acts precipitated or provoked the shooting." (*Id*. at p. 989.)  Nor was his act of traveling to rival gang territory with fellow gang members, at least one of whom was armed, dangerous to human life.  (*Id*. at pp. 989–990.)  Rather, implied malice murder requires a high probability that death will result; the danger to life cannot be merely vague or speculative.  (*Id*. at p. 989; *People v. Cravens* (2012) 53 Cal.4th 500, 513 (*Cravens*) [probability of death cannot be remote or merely possible].) While Reyes's act of traveling with rival gang members into rival territory could result in a gang confrontation during which it was possible someone could get hurt or killed, the act did not by itself "give rise to a high degree of probability" death would result. (*Reyes*, at p. 989.)  And if the act of shooting was the dangerous act, there had to be evidence Reyes knew the shooter intended to shoot, to aid him in shooting, knew shooting was dangerous to life, and acted in conscious disregard to life.  (*Id*. at pp. 991–992.)

The evidence here is substantially different than in *Reyes*. Here, Gutierrez was not merely with fellow gang members when someone else attacked and stabbed Herrera.  Luna testified that

14

Gutierrez was the first person to approach Herrera and hit him.[7] Accordingly, unlike the defendant in *Reyes*, Gutierrez led or provoked the attack on Herrera. Gutierrez also was not alone in beating Herrera: his fellow Mongols, up to six of them, were simultaneously beating Herrera. When Herrera tried to flee, Gutierrez and the other Mongols pursued him. And just minutes before Herrera arrived at the bar, McDonald had given his buck knife to Gutierrez, who never returned it. The medical examiner testified that a buck knife was consistent with the weapon used to stab Herrera. Thus, substantial evidence supports a finding that Gutierrez was the stabber or gave the buck knife to the stabber. Stabbing someone is a life endangering act, as is the act of participating in a group, gang-related beating of one person. (See *Cravens*, *supra*, 53 Cal.4th at pp. 510–511 [violent force of defendant's punch to victim's head was predictably dangerous to human life].)

Other factors such as the "victim's vulnerability, the number of assailants, the ferocity and duration of the attack, and the unusualness or unexpectedness of the victim's death" support the malice finding. (*People v. Superior Court* (*Valenzuela*), (2021) 73 Cal.App.5th 485, 502 (*Valenzuela*).) Herrera was vulnerable in that he was alone, and the attack was sudden and unexpected. Up to six men beat the apparently defenseless Herrera. At least one man was armed with a knife. And based on the medical examiner's testimony, the attack was ferocious because Herrera died as the result of a stab wound with contributing conditions of blunt force trauma.

---

[7] At the evidentiary hearing, Gutierrez's counsel conceded that Gutierrez was the first to use force while inside the bar.

Moreover, after Herrera was stabbed, Gutierrez engaged in behavior evidencing a consciousness of guilt. (See generally CALCRIM No. 371 [attempt to conceal evidence may show defendant was aware of his guilt].) After the fight ended, Gutierrez tried to conceal his identity by demanding that Luna return the raffle ticket on which he had written his name and address. Gutierrez or his companion threatened to " 'take care of' " Luna if she did not return the ticket. In the weeks after Herrera's murder, Gutierrez changed his appearance by removing his facial hair. Gutierrez also added a skull and crossbones patch to his Mongols jacket. (See, e.g., *Cravens*, *supra*, 53 Cal.4th at p. 511 [bragging about crime bolstered implied malice finding].) Queen, who had infiltrated the gang, explained that such a patch must be earned, and, after Herrera's murder, Queen learned that the skull and crossbones patch was given to an individual who had killed for the gang.

Gutierrez also had a gang-related motive to harm or to kill Herrera. (See generally *People v. Chhoun* (2021) 11 Cal.5th 1, 32 ["motive can illuminate intent"].) Gutierrez was a member of the Mongols motorcycle gang, and he was with fellow gang members at the bar that night. When Herrera arrived at the bar, he demanded to know why Luna—a woman Gutierrez had expressed an interest in—was with "fucking Mongols." Herrera thus insulted Gutierrez's gang, which provided a motive for the ensuing fight and stabbing. (See, e.g., *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167–1168 [gang evidence relevant to establish gang-related motive for crime].) Although Gutierrez characterizes this as a mere bar fight, it was something more, a gang-related retaliation against Herrera for insulting the Mongols.

16

The evidence also suggests that nobody, including Gutierrez, tried to help Herrera, but instead they all fled from the crime scene. Failing to assist a wounded victim manifests "a callous indifference to human life." (*People v. Palomar* (2020) 44 Cal.App.5th 969, 978.)

In sum, the evidence showed that Gutierrez directly aided and abetted the implied malice murder of Herrera: Gutierrez was at the crime scene, instigated the fight with Herrera, actively participated in the fight, tried to conceal his identity after the fight, and was rewarded for participating in Herrera's murder. (See generally *People v. Glukhoy* (2022) 77 Cal.App.5th 576, 599 [presence at crime scene, failure to prevent crime, companionship and conduct before and after the offense, including flight, relevant to determine whether a defendant aided and abetted a crime].) And, as we have said, there was substantial evidence Gutierrez engaged in at least the life endangering act of instigating and participating in a physically violent group attack against a lone Herrera.

Gutierrez's argument that this evidence was insufficient to show he aided and abetted an implied malice murder amounts to little more than an improper request that we reevaluate the evidence, something the substantial evidence standard of review forbids. (*Owens*, *supra*, 78 Cal.App.5th at p. 1022.)

Gutierrez thus first argues that what happened is divisible into a "first fight" at the bar's door and a "second fight" down the street. He then argues that he was not at "the second fight," which he asserts is when Herrera was stabbed. There was substantial evidence, however, that this was merely one fight occurring over a short period of time that began just at or outside the bar's door and continued down the street. Luna also testified

17

that the same men who attacked Herrera at the door—a group that included Gutierrez—followed Herrera down the street. Therefore, there was evidence that Gutierrez was involved in the *entirety* of the fight.

Second, Gutierrez highlights the prosecutor's comment at the section 1172.6 hearing that Gutierrez obtained the knife "just moments" before the fight, saying that the comment is inaccurate. However, the evidence is that McDonald gave Gutierrez a buck knife that evening about four or five minutes before the fight broke out. Thus, the essential point is that Gutierrez possessed a knife consistent with the murder weapon in the minutes leading up to the fight.

Third, Gutierrez takes issue with the trial court's finding that he was in a leadership position in the gang and during this incident so that even if he did not actually stab Herrera, he could have stopped the fight. However, the evidence supported this finding: Gutierrez was in a position to give other Mongols orders, as he told McDonald to escort an officer to the bathroom; McDonald gave his knife to Gutierrez when he asked for it; and Aguilar testified that before the fight broke out, Mongols gang members listened to Gutierrez, whom she described as calling the shots. Moreover, Luna testified that Gutierrez was the first person to approach Herrera after Herrera insulted the Mongols, and therefore, as a leader who the Mongols followed, Gutierrez could be viewed as instigating and encouraging the fight, which is a key feature of an aider and abettor. (See, e.g., *Valenzuela*, *supra*, 73 Cal.App.5th at p. 502 [nonstabber defendant instigated and encouraged actual killer's participation in armed melee].)

Finally, Gutierrez argues that Special Agent Queen's testimony about the skull and crossbones did not tend to show

18

Gutierrez killed Herrera. This argument is again based on an improper reweighing of the evidence. Queen testified that during his time in the Mongols as an undercover agent, he learned that a member would be awarded a skull and crossbones patch if they killed for the gang, and a Mongols gang member told him he got a patch for killing a Hell's Angel gang member. Queen then saw Gutierrez wearing such a patch about one month after Herrera's murder. This evidence raises the reasonable inference that Gutierrez was awarded the patch for participating in Herrera's murder. However, as Gutierrez points out, Queen also testified that the Mongols's written constitution does not expressly state that a skull and crossbones patch will be awarded for killing someone and instead stated it would be awarded for "outstanding" work for the gang. Notwithstanding that the Mongols's constitution did not specify members would be rewarded for murder, the trier of fact was entitled to find to the contrary based on Queen's testimony.

We therefore conclude that there was sufficient evidence to support the trial court's finding that Herrera could be convicted of implied malice second degree murder as an aider and abettor.[8]

---

[8] Gutierrez also argues that the prosecutor did not prove beyond a reasonable doubt the trial court's "second murder theory" that he was part perpetrator and part aider and abettor. It is unclear how this argument is separate from whether the evidence was sufficient to support a conviction for implied malice second degree murder. In any event, because we conclude that there was sufficient evidence to support the trial court's conclusion that Gutierrez could be convicted of implied malice second degree murder under current law, we need not reach that argument.

19

## DISPOSITION

The order denying Adrian Gutierrez's Penal Code section 1172.6 petition is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ADAMS, J.

We concur:

EDMON, P. J.

LAVIN, J.